BELL FOOD SERVICES, INC., ET AL. *v.*
FRED SHERBACOW
(14031)

PETERS, C. J., GLASS, COVELLO, HULL and BORDEN, Js.

Argued December 11, 1990—decision released February 19, 1991

*Richard P. Weinstein,* for the appellant (defendant).

*Houston Putnam Lowry,* with whom, on the brief, were *Kenneth J. Levine* and *Peter B. Rustin,* for the appellees (plaintiffs).

BORDEN, J. The issues in this breach of contract action are whether the trial court correctly: (1) awarded damages to the plaintiffs, Bell Food Services, Inc. (BFS), and Philip Mackler, for breach of contract; and (2) admitted two pieces of evidence as falling within exceptions to the rule against hearsay. Mackler had entered into an agreement to purchase the interest in BFS of the defendant, Fred Sherbacow, its former president. As part of the agreement, the defendant had warranted that BFS had no outstanding corporate debt. After the purchase, the department of revenue services assessed BFS with a sales and use tax deficiency, and BFS paid $39,104.91 in settlement of the assessment. The plaintiffs then sued the defendant,

relying on a covenant in the parties' contract that BFS had no outstanding corporate debt, to recover the amount of taxes paid in satisfaction of the deficiency. The trial court found that the defendant had breached the agreement, and awarded damages to the plaintiffs.

The relevant facts are undisputed. BFS is a full-line vending machine company that sells items valued at thirty-five cents to over $2. Initially, Mackler was the sole shareholder and president of BFS. In 1978, Mackler hired the defendant to assist him in operating the business. Three years later, the defendant became president and director of BFS, purchasing a 50 percent common stock interest in the corporation. Mackler, although remaining chairman of the board, entrusted the day-to-day operations of BFS to the defendant. After that time, Mackler's only involvement with BFS consisted of reviewing the monthly financial statements of the corporation.

In 1988, the defendant and Mackler had a dispute concerning Mackler's salary from BFS and the potential termination of his relationship with the corporation. In order to resolve the dispute, Mackler and the defendant entered into a letter of intent whereby Mackler agreed to purchase the defendant's interest in BFS and the defendant made certain financial covenants regarding BFS.[1] In particular, the defendant warranted that, with the exception of trade debt, BFS had no outstanding debt at the time of the closing.

---

[1] The letter of intent provided in relevant part:
"SECTION 2 - PURCHASE PRICE:

PHILIP MACKLER shall pay to FRED SHERBACOW the following amounts (Purchase Price):

$750,000.00 at the Closing
$200,000.00 on or before one (1) year from Closing
$200,000.00 on or before two (2) years from Closing
$250,000.00 on or before three (3) years from Closing
$250,000.00 on or before four (4) years from Closing
$450,000.00 on or before five (5) years from Closing . . . .

Mackler assigned to BFS the right to purchase the stock of the corporation and the obligation to pay the purchase price.[2] Thereafter, BFS was audited by the department of revenue services and assessed with a deficiency for unpaid sales taxes on food items valued over $2, and for unpaid use taxes for equipment purchased outside Connecticut for the period of December, 1985, through December, 1988. BFS paid the asserted deficiency of $39,104.91[3] in sales and use taxes for the period in issue. The plaintiffs then brought suit

SECTION 4 - FINANCIAL COVENANTS:

FRED A. SHERBACOW warrants and represents to PHILIP MACKLER that:

(a) Bell Food Services, Inc. shall have a net equity of at least $1,500,000.00 as of the date of the Closing . . .

(h) Bell Food Services, Inc. has no corporate debt outstanding as of the date of the Closing, (except for trade debt incurred in the ordinary course of business) . . . .

SECTION 5 - BREACH OF COVENANTS:

If the covenants in Section 4 are breached, then such funds necessary to prevent a breach of the covenant(s) shall be deducted from the Purchase Price starting with the most recent payment."

[2] The assignment provided as follows:

"ASSIGNMENT

I, Philip Mackler of 13029 Bald Cypress Lane, Naples, Florida, 33999, hereby assign to Bell Food Services, Inc. of Commerce Street, Glastonbury, Connecticut 06033 all of my rights to purchase the Stock of Fred A. Sherbacow in Bell Food Services, Inc. and delegate to Bell Food Services, Inc. all of my obligations to pay any sums to Fred A. Sherbacow pursuant to our Settlement Agreement entitled 'Letter of Intent' dated September 28, 1988.

Dated at Farmington, Connecticut as of this 31st day of October, 1988.

/s/Philip Mackler

Philip Mackler

ATTESTED BY:

BELL FOOD SERVICES, INC.

/s/Philip Mackler

Philip Mackler

Its Duly Authorized President"

[3] The tax error form submitted to the department of revenue services showed that BFS was responsible for $31,719.89 in past sales and use taxes and $7385.02 in interest accrued.

against the defendant to recover damages, claiming breach of contract, breach of fiduciary duty, and fraudulent misrepresentation.

The trial court determined that the defendant had breached the agreement,[4] and awarded the plaintiffs damages totaling $36,579.31.[5] The defendant appealed from the judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023.

The defendant claims that the trial court incorrectly: (1) awarded damages to the plaintiffs for breach of contract; (2) admitted into evidence a photocopy of a sales and use tax error form of BFS pursuant to the business record exception to the rule against hearsay; and (3) admitted into evidence testimony of the present comptroller of BFS concerning statements made by the previous comptroller. We affirm the judgment of the trial court.

I

The defendant first claims that the trial court incorrectly awarded damages to the plaintiffs because neither of them suffered any damage as a result of the alleged breach of contract. In support of his claim, the defendant argues that: (1) Mackler was not injured because he suffered no pecuniary loss as a result of the alleged breach; (2) BFS was not entitled to recover because it was neither a party to the contract nor a third party beneficiary thereof; and (3) the trial court incorrectly considered the element of reliance when determining that the contract was breached. On the basis of the record presented for review, we disagree.

---

[4] The trial court held that the plaintiffs had not proven their claims of breach of fiduciary duty and fraudulent misrepresentation.

[5] It is unclear from the record why the judgment was in the sum of $36,579.31 rather than $39,104.91, the amount BFS paid in satisfaction of its deficiency.

The defendant does not challenge the trial court's finding that he breached the contract. He claims that Mackler was not damaged because the corporation, not he, paid the tax deficiency, and because the value of the corporation met or exceeded its value represented in the contract, even after the payment of the deficiency. This argument, however, ignores § 5 of the agreement, providing in effect that the purchase price that Mackler paid was to be reduced by the amount of "such funds necessary to prevent a breach of the [financial] covenant(s) [in § 4]." See footnote 2, supra. There was ample evidence for the court to find that the defendant's breach of the corporate debt covenant resulted, under § 5, in Mackler's right to recover the amount necessary to remedy that breach. The fact that BFS, rather than Mackler, paid the tax liability, as would be the case with respect to any corporate debt, does not help the defendant because the court found in effect that, had Mackler been aware of the outstanding tax liability, he would have paid less to the defendant for his stock. We note that, although the court determined that both plaintiffs were damaged, it properly awarded only one recovery to the plaintiffs jointly.

The defendant's claim that BFS could not be awarded damages rests on his argument that BFS was neither a party to nor a third party beneficiary of the purchase agreement. This argument, however, ignores the assignment from Mackler to BFS and the trial court's implicit finding regarding its scope.

The finding of the trial court was limited to a determination that the defendant breached the contract. Although the trial court denied the defendant's request for articulation of its decision to award damages to both plaintiffs, the defendant failed to request review of that

denial pursuant to Practice Book § 4054.[6] We have previously held that it is the responsibility of the appellant to provide an adequate record for review. Indeed, in *Stamford Apartments Co.* v. *Stamford,* 203 Conn. 586, 590 n.1, 525 A.2d 1327 (1987), we explicitly noted that if a defendant is dissatisfied with the trial court's answer to his request for articulation, it is his responsibility to move for review pursuant to Practice Book § 4054.

The language of the assignment; see footnote 3, supra; is unclear with respect to its possible applicability to the right to sue for breach of the financial covenants contained in the agreement. Implicit in the trial court's judgment awarding damages to both plaintiffs is a finding that the intended scope of the assignment from Mackler to BFS was for both of them to share the obligation to pay under the contract and, correspondingly, for both of them to share the right to recover for its breach.[7] Where an appellant has failed to avail himself of the full panoply of articulation and review procedures, and absent some indication to the contrary, we ordinarily read a record to support, rather than to contradict, a trial court's judgment. *Stamford Apartments Co.* v. *Stamford,* supra. Since the defend-

---

[6] Practice Book § 4054 provides in pertinent part: "[MOTION FOR REVIEW]— REVIEW OF MOTION FOR RECTIFICATION OF APPEAL OR ARTICULATION

"Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Sec. 4051 may make a written motion for review to the supreme court, to be filed with the chief clerk of the supreme court, and the supreme court may, upon such a motion, direct any action it deems proper."

[7] The interpretation of the assignment, absent statutory warranty or definitive contractual language, was a question of the intention of the parties to it and, therefore, a question of fact. See *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981). In order for the defendant to prevail on this issue, therefore, he would have to show that the trial court's implicit interpretation of the assignment was clearly erroneous. *A. Dubreuil & Sons, Inc.* v. *Lisbon,* 215 Conn. 604, 609, 577 A.2d 709 (1990).

ant did not move for review, we read this record to incorporate that implicit finding. On the basis of that finding, we have no reason to find clearly erroneous the trial court's conclusion that BFS, as well as Mackler, was damaged by the breach of the contract. This is particularly true since BFS actually paid the tax deficiency.

The defendant next argues that the trial court improperly considered reliance, an element of promissory estoppel, in determining whether a breach of contract existed. In its memorandum of decision, the court found that "[t]he plaintiff Mackler purchased the defendant's stock in reliance upon the financial statement . . . which did not disclose [the plaintiff] BFS's liability for an unpaid sales and use tax existing as of November 3, 1988." An examination of the context in which the trial court used the word "reliance," however, defeats the defendant's claim that "the trial judge based his award of damages largely on his finding of reliance." Rather, it is clear that the trial court used the word "reliance" simply to express the notion that the price Mackler paid for the defendant's stock in BFS was based on the corporation's net worth as set forth in the financial statement, and that Mackler would have paid less had the warranty and representation concerning the outstanding corporate debt of BFS been accurate.

II

The defendant next claims that the trial court incorrectly admitted into evidence, over objection, a photocopy of a department of revenue services tax error form[8] pursuant to the business records exception to the

---

[8] The form at issue is entitled "Request for Application of Payment to Certain Errors Discovered During Audit Examination." At the top of the form is printed the address for the Connecticut department of revenue services.

rule against hearsay. The tax error form in question, which was in the possession of BFS, set forth, inter alia, the amount of sales and use tax liability of BFS and the interest thereon, the specific tax errors made by BFS, the tax periods involved, the purported signature of BFS' former comptroller, John Rosenthal, and the purported date on which the sum was remitted. This document established the amount of sales and use tax liability paid by BFS in satisfaction of the assessment by the department of revenue services.

The defendant argues that the tax error form was incorrectly admitted pursuant to the business records exception to the rule against hearsay; General Statutes § 52-180;[9] because the plaintiffs were unable to show: (1) who made the tax error form; (2) whether the tax error form was made contemporaneously with the event recorded, namely, the payment of the assessed

---

[9] General Statutes § 52-180 provides: "ADMISSIBILITY OF BUSINESS ENTRIES AND PHOTOGRAPHIC COPIES. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility.

"(c) Except as provided in chapter 3, if any person in the regular course of business has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of them to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other process which accurately reproduces or forms a durable medium for so reproducing the

taxes; and (3) whether the tax error form was prepared during the regular course of business. The defendant also argues that, because the witness through whom the tax error form was admitted could not provide the above information, the record was not "satisfactorily identified" to support the admission of a photocopy pursuant to § 52-180 (c). We disagree.

"To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 383–84, 461 A.2d 422 (1983). It is not necessary, however, that the witness have been the entrant himself or in the employ of the business when the entry was made. *State* v. *Damon,* 214 Conn. 146, 157, 570 A.2d 700 (1990). In applying the business records exception, "the statute [§ 52-180] should be liberally interpreted. See *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* 154 Conn. 593, 597, 227 A.2d 548 (1967). In part, this is due to the fact that the statute recognizes that the trustworthiness of such documents comes from their

original, the original may be destroyed in the regular course of business unless its preservation is otherwise required by statute. The reproduction, when satisfactorily identified, shall be as admissible in evidence as the original in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of the reproduction shall be likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile shall not preclude admission of the original.

"(d) The term 'business' shall include business, profession, occupation and calling of every kind."

being used for business and not for litigation." *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* supra, 388–89. Thus, the fact that the business relies on such records tends to establish their trustworthiness.

The defendant first argues that, because the plaintiffs' witness could not testify whether the tax error form was completed by Rosenthal or the state auditor, the plaintiffs did not satisfy the requirements of § 52-180 that the particular record was made in the regular course of business and that it was the regular course of business to make such record. This argument is without merit.

At trial, the plaintiffs introduced the tax error form through the present comptroller of BFS, Jim Downey. Downey testified that the signature on the tax error form was that of John Rosenthal, the comptroller during the tax period in issue, and that he recognized Rosenthal's signature on the document. The defendant argues that, because on voir dire Downey testified that he did not know whether an auditor from the state could have filled out the tax error form instead of Rosenthal, the plaintiffs did not show that: (1) it was the regular course of BFS' business to prepare such a record; and (2) the record was prepared in the ordinary course of BFS' business.

The defendant's argument ignores the fact that Downey identified the signature on the tax error form as that of Rosenthal. Therefore, whether Rosenthal filled out the form himself or adopted the information contained therein pursuant to his agency powers as comptroller, it was within the trial court's discretion to determine that the tax error form was BFS' record. Furthermore, Downey testified that the document was kept in the ordinary course of BFS' business because it was required by law to do so. Indeed, General Stat-

utes § 12-426 (3) provides that "[e]very seller [and] every retailer . . . shall keep such records, receipts, invoices and other pertinent papers . . ." relating to sales and use taxes. Therefore, in light of the general proposition that the business records exception is to be interpreted liberally; *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.*, supra, 388; the trial court did not abuse its discretion in determining that the tax error form was kept in the ordinary course of business.

The defendant also argues that the plaintiffs did not show that the tax error form was prepared contemporaneously with the occurrence of the event recorded, namely, the payment of the sales and use taxes. This claim is likewise without merit. The tax error form was made to record BFS' mistakes in its past sales and use taxes, and to calculate the amount of taxes and interest thereon that BFS was responsible to pay to the department of revenue services. The form was signed by Rosenthal on June 28, 1989, and also contains a notation that BFS paid the taxes owed on that date. It was within the discretion of the trial court to determine that the tax error form was made contemporaneously with the payment of the owed sales and use taxes that it recorded. The defendant's argument that the court improperly admitted the photocopy of the document as not "satisfactorily identified" is based on the assertion that the witness did not identify when or by whom the document was made. Because of our determination that the plaintiffs did, in fact, demonstrate that the document was made in the regular course of BFS' business, that Rosenthal either filled out the tax error form or adopted its contents upon signing it, and that it was made contemporaneously with the event it recorded, however, this claim is without merit.

## III

The defendant next claims that the trial court incorrectly admitted into evidence certain hearsay statements pursuant to an "admission against interest" exception, and that the admission of this evidence requires reversal of the judgment. While we agree that the evidence was inadmissible hearsay, we conclude that the admission does not constitute sufficient grounds for reversal.

The trial court allowed the plaintiffs to introduce testimony by BFS' present comptroller, Downey, that the former comptroller, Rosenthal, told him that BFS paid the $39,104.91 in sales and use taxes because it "had no defense on that part of the tax. It was obviously not paid, period." Upon objection by the defendant, the plaintiffs argued that the statements were admissible as an "admission against interest," and the court allowed the evidence.

"A statement made out of court that is offered to establish the truth of the facts contained in the statement is hearsay." C. Tait & J. LaPlante, Connecticut Evidence (1st Ed.) § 11.1; see also *Murray* v. *Supreme Lodge, N.E.O.P.,* 74 Conn. 715, 718, 52 A. 722 (1902). In this case, the out-of-court statements by Rosenthal were offered to prove that BFS had not paid the taxes and had no defense for not doing so, and the plaintiffs do not assert otherwise. Therefore, this hearsay evidence was inadmissible unless it fell within one of the recognized exceptions to the hearsay rule.

At trial, the plaintiffs asserted that the statements were admissible as an exception to the rule against hearsay because they constituted "admissions against interest." We have previously held the term "admissions . . . against interest" to be an inappropriate frame of reference; *Falker* v. *Samperi,* 190 Conn. 412,

424 n.16, 461 A.2d 681 (1983); and in this circumstance we will instead deem the relevant evidentiary referrent to be to an admission by a party opponent.[10]

The "admissions of a party opponent" exception requires that the hearsay evidence be offered by the party who is the opponent to the party declarant. *State v. Tyson*, 23 Conn. App. 28, 34, 579 A.2d 1083 (1990) (defendant could not offer own statement under admission exception); *State v. Brown*, 22 Conn. App. 521, 523, 577 A.2d 1120 (1990). Here, the offering parties were the plaintiffs, who were offering the hearsay testimony, not of the defendant Sherbacow, their opponent, but of Rosenthal, who was not a party opponent to them. In fact, when Rosenthal purportedly made the statement, he was still employed by BFS, a factor that supports the conclusion that he was not an opponent of either Mackler or BFS.[11]

We conclude, however, that the admission of the hearsay testimony by Downey constituted harmless error. The primary issue in this breach of contract case was whether the defendant was responsible to BFS for the amount of sales and use taxes owed to the state by virtue of his covenant to Mackler that BFS had no outstanding corporate debt as of the date of the contract. The defendant presented no evidence that the

[10] It is clear from an examination of the transcript and from the brief of the plaintiffs that they were not arguing that the evidence was admissible under the declarations against interest exception to the rule against hearsay. The fact that the plaintiffs did not attempt to establish the unavailability of the declarant, Rosenthal, a primary element of the declarations against interest exception; C. Tait & J. LaPlante, Connecticut Evidence (1st Ed.) § 11.6; further supports our conclusion that the plaintiffs were relying solely on the admissions of a party opponent exception to the rule against hearsay.

[11] Since we conclude, however; see text infra; that the admission constitutes harmless error, we need not fully consider the plaintiffs' argument that Rosenthal was somehow an agent of Sherbacow for purposes of the admission by a party opponent exception. Suffice it to say that we can find no support in this record for that assertion.

sales and use taxes paid by BFS for the period of December, 1985, through December, 1988, were not actually owed;[12] rather, he primarily contested whether he should be held responsible for reimbursing BFS therefor. The plaintiffs established their case that the taxes were owed in the amount claimed principally through the proper admission of the tax error form. The inadmissible hearsay evidence was simply cumulative and supplementary to that evidence, and it is unlikely that it affected the court's judgment.

The judgment is affirmed.

In this opinion the other justices concurred.

[12] The taxes paid by BFS to the department of revenue services were for: (1) use taxes associated with the purchases of supplies and equipment; and (2) sales taxes associated with the sale of individual food items costing $2 or above.

The defendant did not introduce evidence that the amount of taxes actually paid by BFS in settlement of the audit was excessive or incorrect. Additionally, on cross-examination, the defendant agreed that purchases of equipment from outside Connecticut are subject to the use tax, and that meals over $2 are subject to the sales tax. Furthermore, when asked what steps he took to ensure that the sales tax due on meals over $2 was paid, the defendant responded that "[q]uite honestly, it counted for such a small percentage of our total business that I just overlooked it," and that "I never even thought of it." The defendant also testified that there was no system in place at BFS to check whether the use tax was paid on the equipment that it purchased out of state.